This is an appeal by Allstate Insurance Company (Allstate), plaintiff, from a jury verdict in favor of the defendants, Alexander Portis and Henry E. Coats, in Allstate's action for a declaratory judgment. We affirm.
In its action, Allstate sought an interpretation and application of an exclusion contained in a policy of homeowners insurance issued by it to Portis. The exclusion in question states:
 "We do not cover bodily injury or property damage intentionally caused by an insured person."
Allstate's declaratory judgment action was an outgrowth of a wrongful death action brought by Henry E. Coats, as administrator of the estate of John Coats, against Alexander Portis. In that action, Coats alleged:
 "2. On or about the 28th day of January, 1981, John H. Coats, deceased, was in his backyard located in Thomasville, Clarke County, Alabama, at the same time and place the Defendant was in the vicinity of Plaintiff's property located in Clarke County, Alabama, and the Defendant negligently caused a pistol to fire and strike the Plaintiff in the lower left abdomen.
 "3. As a proximate result, John H. Coats suffered serious bodily injuries and was caused to incur expenses of doctors, hospitals and medicines in an attempt to heal said injuries; Plaintiff suffered excruciating pain and mental anguish on account of said injuries."
In Count Two of his complaint, Coats alleged that John Coats died as the proximate result of the aforesaid injuries. The wrongful death claim has been continued pending the outcome of this appeal. *Page 998 
The case proceeded to trial, with Allstate and Portis moving for a directed verdict at the close of plaintiff's case and at the close of all the evidence. These motions were denied. The defendants did not introduce any evidence. The jury returned a verdict for the defendant and against the plaintiff, Allstate. This appeal followed.
Plaintiff has presented two questions for our consideration on this appeal:
(1) Whether the evidence adduced in the trial established that the insured, Portis, intentionally caused bodily injury to the deceased, John Coats, thereby requiring that the specific exclusion be given effect.
(2) Whether the trial court erred to reversal by refusing to admit into evidence the testimony of the victim's wife, Bertha Coats, since deceased.
 I.
Allstate maintains that the evidence at trial established that the insured, Portis, did intentionally shoot the victim, John Coats, and thus that it owed no insurance coverage to Portis under the terms of the above-quoted exclusion. Allstate refers us to a number of exhibits introduced below, consisting of statements made by Portis and testimony by witnesses who interviewed Portis.
This evidence established that Portis and the victim, John Coats, were neighbors who had a continuing dispute concerning the boundary line between their properties. According to Portis, John Coats had threatened Portis's life on occasions prior to the incident in question, and had removed plants, grass, and boundary markers placed upon the boundary by Portis. On the day of their last confrontation, Portis observed John Coats digging up plants Portis had planted the day before. Arming himself with a .32-caliber pistol he kept in his house, Portis walked out to a point near John Coats, who, according to Portis, began to curse and to threaten him. At this point, the parties disagree on the circumstances which led to the shooting of John Coats.
Allstate introduced statements which Portis gave shortly after the shooting. In one of these, made to the Thomasville chief of police, Portis stated:
 "He [John Coats] was coming toward me with a shovel when I shot him, and I think I hit him the first shot. I felt that my life was in danger and there was nothing else to do."
To a district attorney's deputy and to a district attorney's investigator, Portis stated:
 "With these threats in mind I got my .32 pistol from under the bed and me and my wife went outside. Me and my wife walked up to about 15 feet away from him [John Coats]. I just stood there and didn't say a word to him. He looked up at me and said what the hell do you want. He dropped his post hole digger and picked up his shovel. He repeated what the hell do you want 3 times as he advanced towards me. I backed up . . . about 15 or 20 feet from him to my side of my property. I kept backing up and ended up by his front porch. Our houses are about 50 feet apart. As I backed up north he kept the shovel raised up in his hand. I was a distance from him. He had the shovel and he said I'm going back up to my house and get my gun, I'm going to kill you. That was the moment I didn't know what to do. I didn't want him to get his gun and shoot me so I shot him.
". . .
"I think I shot twice.
". . .
 "I pulled the trigger twice. It didn't fire the third time I pulled the trigger. It fired twice and the last time it didn't fire.
". . .
 "He had the shovel raised in the air and I felt like my life was in danger."
Portis made substantially the same statement to Doug Painter, a representative of Allstate. Each of these persons to whom Portis had given these statements testified as a witness and verified those versions of the incident as given to them by Portis. *Page 999 
Portis himself also testified as a witness in the declaratory judgment action. He related the difficulties he had experienced with John Coats over the boundary line, explained his reason for arming himself, and described the altercation up to the point just prior to the shooting:
"Q. . . . Did he pick up the shovel?
 "A. I'm getting to that. He [John Coats] shoved — he pushed his post hole digger over, reached down to get a shovel. We both was talking at the same time. I was walking around him to his left and hoping that I would stop him from going into his house.
 "He picked up the shovel, threw his post hole digger down, picked up the shovel. He said I'm going in the house and get my gun, you son of a bitch, and kill you when I get back out.
 "He had the shovel. I was backing up at the same time. With new ground and tools, we was stepping real high due to the fact we were walking backwards. As a man knows, when you walk backwards on new ground with tools around, you have to pick your feet up not to stumble.
 "As I was backing up I felt the wire fence on the ground, the posts and the tools. And I was going back out of his way. He couldn't catch up with me due to the fact I was 75 or 100 feet from him, I don't know exactly this one. He couldn't catch me. He threw the shovel down. He said I got a gun. He pulled his shirt up. I could see a white handled gun in his belt, pearl handled gun, pearl handles, that's right.
 "Anyway he pulls the gun out. As he pulled up his shirt, I could see a white pearl handled gun in his belt. He grabs it.
"Q. Did he fire at you?
 "A. He grabs it and as I was walking back, stumbling over tools and backed up into the fence where the running rose bush with thorns and stickers in them. As I backed up the thorns and stickers hit me in the back and was sharp. I was falling backwards in the position as I hit the wall. The gun went off and he was grabbing his gun at the same time. The bullet I imagine hit his hand.
"Q. Hit him in the stomach?
 "A. I don't know where it hit him but somewhere right in the stomach there.
 "Q. As I understand it you're claiming he was threatening your life?
 "A. I explained that he told me several times — he told the officer when I called him out there, the policeman, what he was going to do to me.
 "Q. You're claiming Mr. Coats had a gun as he was coming after you?
"A. Definitely.
"Q. No doubt in your mind?
"A. No doubt in my mind.
 "Q. You're not claiming he had a shovel over his head until he threw it down?
 "A. Right, right. He had the shovel due to the fact it was about 200 feet play between the border line and his house. I imagine he traveled about 50, 60, 70 feet with the shovel. He couldn't catch up with me. Then he throwed the shovel down and said I got my gun on me, I'm going to shoot you.
 "Q. You're claiming your gun accidentally went off when you backed into a rock?
 "A. Right and into running rose bush, old running rose bush that had stickers on it hit my arm and back. I was coming at the same time, going back. We both was talking and —"
The decision of this Court in Alabama Farm Bureau MutualCasualty Ins. Co. v. Dyer, 454 So.2d 921 (Ala. 1984), leads to a result contrary to that sought by Allstate here. In that case, the exclusion was for "bodily injury or property damage which is either expected or intended from the standpoint of the insured." In that case, two brothers, William and Wayne Dyer, had been drinking one evening and began arguing about a water ski William had bought from Wayne. William wanted his money back. The money was offered, but William said he would wait until the next morning when they were both sober. Wayne then *Page 1000 
pulled a revolver, pointed it at his brother, and fired, fatally wounding him.
In reciting the evidence of that case, this Court noted at 926:
 "In particular, Tommy Long, the sole eyewitness, testified at trial that the Dyer brothers enjoyed a longstanding amicable relationship which was in no way jeopardized by the trivial argument which precipitated the shootings. In fact, Long was so unconcerned about the argument that he went into the house and started eating supper. Long was not even surprised when Wayne pulled out a gun and pointed it at William:
 "`Well, it happened so fast. It surprised me that [the gun] went off, is what surprised me. Not particularly pulling the gun. It surprised me that it went off.'
 "According to Long, after the gun discharged and shot William, Wayne was shocked and stunned and asked Long to call an ambulance for his brother. Soon thereafter, Wayne killed himself. An investigation following the shootings revealed that the gun was only partially loaded during this period."
Recognizing that the question of whether an injury which the insured inflicts upon another is "expected or intended from the standpoint of the insured" is a question of fact for the judge or jury, this Court proceeded in Dyer to analyze our previous decisions to determine whether that principle was to be measured by an objective or a subjective standard, and concluded:
 "We therefore hold that a purely subjective standard governs the determination of whether the insured Wayne Dyer either expected or intended to inflict bodily injury upon his brother, William. Under this subjective test, an injury is `intended from the standpoint of the insured' if the insured possessed the specific intent to cause bodily injury to another, whereas an injury is `expected from the standpoint of the insured' if the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act. See Continental Western Ins. Co. v. Toal
[309 Minn. 169], 244 N.W.2d 121, 125 (Minn. 1976), for a thorough discussion of the proper standard used to interpret this policy exclusion." (Emphasis added.) 454 So.2d at 925.
Applying this principle, it is clear that the evidence of Portis and the evidence of the other witnesses conflicted. According to Portis's testimony, the victim had a "white pearl handled gun" in his belt, and as Portis backed away in the midst of thorns and stickers, falling backwards, the gun he was holding went off. Thus, he claimed, his gun went off accidentally. The other witnesses testified that Portis had stated to them that he had fired intentionally, albeit in self-defense. Clearly, this conflict in the evidence made an issue for the jury on Portis's intent to cause injury.
 II.
We need not reach the question concerning the refusal to admit the testimony of Bertha Coats. Allstate made no offer of proof; hence, we are not informed of the proposed testimony, nor can we ascertain its purpose. 2 Ala. Digest Appeal Error, Key 205.
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur. *Page 1001